UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.:

CHG   HEALTHCARE   SERVICES,
INC., a Delaware Corporation,

               Plaintiff,

v.

ELIZABETH HALE, an individual, and
MEDPARTNERS   LOCUM   TENENS,
INC., a Florida Corporation,

              Defendants.

_____

## VERIFIED COMPLAINT

Plaintiff, CHG Healthcare Services, Inc. ("CHG"), by and through its undersigned

counsel, hereby files this Verified Complaint against Defendants, Elizabeth Hale ("Hale") and

MedPartners Locum Tenens, Inc. ("MedPartners"), and alleges as follows:

## JURISDICTION AND VENUE

1.       This is an action for temporary and permanent injunctive relief, for attorneys' fees

and costs and for damages.  This Court has original jurisdiction of this case, pursuant to 28

U.S.C. § 1332, as there is complete diversity of citizenship between the Plaintiff and Defendants

and the amount of controversy exceeds $75,000.00.

2.       CHG is a Delaware corporation with its principal place of business at 6440 South

Millrock Drive, Suite 175, Salt Lake City, Utah 84121.

3.       CHG is the parent corporation of Weatherby Locums, Inc., which is located in

Broward County, Florida.

4.     MedPartners is a Florida corporation with its principal place of business at 5810 Coral Ridge Drive, Suite 250, Coral Springs, Florida 33076.

5.     Upon information and belief, Defendant Hale is, and at all times relevant hereto was, an individual residing in Broward County, Florida.

6.     This Court has personal jurisdiction over Defendants Hale and MedPartners because, among other things, at all times relevant, Defendants Hale and MedPartners operated, conducted, engaged in, or carried on a business or business venture in the state of Florida and Defendant Hale resided in Florida.

7.     The causes of action alleged herein arise primarily out of acts or omissions in Fort Lauderdale, Florida.  Pursuant to 28 U.S.C. § 1391, venue is proper in this district and division because Defendants engage in business and reside within this judicial district and a substantial part of the harm caused to CHG by Defendants' conduct occurred in this district.

8.     All conditions precedent to bringing this action have occurred, have been satisfied, or have otherwise been waived.

## BACKGROUND FACTS

### CHG's Business

9.     CHG has divisions throughout the United States, including the Weatherby Locums, Inc. office located in Broward County, Florida.

10.     CHG is in the business of national recruiting, staffing and placing healthcare and healthcare-related personnel, including physicians, nurses, and allied healthcare professions of all specialties, with healthcare related businesses (*e.g.*, hospitals, clinics, medical practices, healthcare institutions, etc…) on a permanent and/or temporary basis.

11.     CHG's staffing businesses contract with the various facilities with which they

have a relationship.  These facilities may also be parties to similar contracts with competitor staffing companies.

12.     In fact, the healthcare-staffing industry is a highly competitive industry with over 300 major participants nationwide, all of which compete with CHG in some or all aspects of its business.

13.     A facility which has a staffing need will notify all staffing companies with which it has a relationship of the particular need it may have, be it for a physician, nurse, or other healthcare professional.

14.     Upon receipt of a notice from a client facility, the staffing company will seek to recruit an appropriate candidate for the position from its database of qualified professionals or through the development of new relationships with interested professionals.

15.     A staffing company will present qualified candidates to the requesting facility and will compete with other staffing companies to convince the facility to accept the candidate that it is presenting rather than candidates presented by its competitors.  A staffing company is generally only compensated by a facility upon a decision to accept a candidate presented to it by that staffing company.

16.     The value CHG provides to its healthcare-provider clients depends on CHG's network of relationships and its goodwill:  CHG recruits healthcare professionals, assembles talent into a database, then draws from this recruited talent to fill open positions at client facilities.

17.     CHG's reputation, course of dealing, and history with facilities can lead to a level of trust and confidence in CHG, which renders the facility more likely to hire a candidate presented to it.  This goodwill is developed not only through assurance that only highly qualified

3

and skilled professionals are presented for consideration, but also based upon the relationships developed over the course of time between facilities and the CHG personnel who they interact on a regular basis.

18.     CHG's goodwill with healthcare professionals is extremely important and valuable.  As noted above, CHG maintains a database of qualified personnel who it may contact upon discovery of an appropriate opportunity.  The professionals – whether doctors, nurses or otherwise – often have many choices of staffing agencies through whom they may seek work opportunities.

19.     It is important that the professionals develop a level of trust and confidence in CHG through their interactions with CHG personnel so that they know they will not be contacted for positions in geographic locations which are unacceptable, for positions for which they are not qualified or outside their expertise, or for positions where the compensation is simply not adequate.

20.     Because several candidates may be presented for any particular open position by any number of staffing agencies, it is common that a professional may not be selected for the first position for which they are presented.  CHG will, however, retain that candidate's information and maintain a relationship with those professionals in the event another, perhaps more suitable opportunity arises in the future.  It is important to CHG that the professional remain affiliated with and willing to consider positions proposed by CHG.

21.     A Senior Director at CHG, such as Plaintiff, has frequent contact with the healthcare professionals CHG hopes to eventually place at client facilities.  A Senior Director, among other duties, is responsible for maintaining CHG's relationships with professionals and clients and assuring that CHG has a substantial database of interested and willing professionals

from which to recruit upon notification of an employment opportunity by one of the facilities with which CHG contracts.

22.     CHG has expended substantial amounts of time, money, and effort to develop its senior personnel, as well as its trade secrets and/or valuable confidential business information provided to its senior personnel, to enable them to perform their jobs.   These senior level employees are provided with trade secrets and confidential, proprietary information.   CHG derives independent economic value from this information not being generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use.

## Hale's Employment with CHG

23.     In 2011, CHG hired Hale to work as a Director of its Pediatric and Pediatric Subspecialties ("Pediatric") Team at its Broward County location known as Weatherby Healthcare.

24.     In 2014, Hale was promoted to Senior Director of the Pediatric Team and oversaw approximately seventeen (17) consultants and two (2) sales managers.   These consultants and managers were responsible for business development within Weatherby Healthcare, specifically, client and healthcare personnel recruitment and lead generation and account maintenance.

25.     Throughout her employment at CHG, Hale was directly involved in CHG's operations including, but not limited to, creating and implementing an operating strategy designed to drive performance and achieve profit goals; developing and training sales managers; developing best practices that support the division's growth initiatives; working with sales managers, in addition to the two managers she supervised, to develop and execute ongoing staffing plans inclusive of recruiting, hiring, training and development; integrating senior

leaders; creating competitive credentialing processes; participating in senior leadership meetings; developing and strengthening relationships that support the division's strategic goals and initiatives; and overseeing the strategic direction of one or more teams.  As a result of her high-level leadership role, Hale's responsibilities and duties were unique, special and extraordinary.

26.     Through her employment, Hale was educated and trained by CHG, as she came to the Company with no background in locum tenens (the Latin phrase used in this industry to describe temporary physician placement).  Hale gained knowledge of trade secrets and other confidential and proprietary information of CHG, including, but not limited to, information relating to current, former and prospective clients; strategies for competitive credentialing of healthcare professionals; methods and types of recruitment and placement services preferred by CHG's clients; sales and marketing techniques; strategic training and coaching methods for employees and leadership; and financial information relating to the business of CHG.

27.     By virtue of her employment with CHG, Hale was provided the education and training to perform her high-level leadership role and granted access to CHG's trade secrets and confidential and proprietary information, including client lists, business strategies, business models, pricing information, and costs.

### Hale's Agreement with CHG

28.     As an express condition of her employment and continuing employment with CHG, Hale entered into an Employment Agreement Including Confidentiality, Non-Competition and Non-Solicitation Provisions ("Employment Agreement") with CHG on February 12, 2015. A true and correct copy of the Employment Agreement is attached as Exhibit A.

29.     The Employment Agreement contains, *inter alia*, the following provisions which describe Hale's obligations to protect CHG's confidential and proprietary business information, during and after her employment with CHG:

(a) Executive [Hale] covenants and agrees to not, at any time or in any manner, use any of the Confidential Business Information for any purpose other than as reasonably necessary in the performance of Executive's duties for the Company and for the exclusive benefit of the Company.  Executive shall not at any time, both during and after employment with the Company (regardless of the manner or reason of termination or cessation of employment with the Company), or in any form or manner, either directly or indirectly, copy, disseminate, divulge, transfer or communicate any Confidential Business Information to any other employee or to any other person or entity except as reasonably necessary in the performance of Executive's duties for the Company.

(b) Executive agrees that all Confidential Business Information is the sole and exclusive property of the Company.  Executive further agrees that all files, documents, works, papers, electronic files and information and other materials containing any Confidential Business Information or information which Executive  prepares, uses, possesses or controls that affects or relates to the business  of the Company are the sole property of the Company. Executive agrees to take all steps necessary, and all steps requested by the Company, to ensure that the Confidential Business Information is kept confidential and comply with all applicable policies and procedures of the Company regarding the use, disclosure, maintenance and security of the Confidential Business Information.

See Exh. "A," ¶ 4.

30.     The Employment Agreement also contains the following post-employment non-competition provisions:

Executive agrees that, beginning on the Effective Date and continuing for one (1) year from the later of (i) the date Executive's employment with the Company is terminated or otherwise ceases (regardless of the manner or reason of termination or cessation) or (ii) the latest date on which Executive breaches any of the provisions of Sections 4, 5, 6, or 7 hereof (the later one-year period being referred to as the "Covenant Period"), Executive shall not, anywhere in the United States, directly or indirectly, individually  or jointly, whether  as  an  officer,  director,  partner,  shareholder,  member,  owner,

employer, employee, agent, independent contractor, advisor, consultant, debtor, grantor, or otherwise, engage in, have an interest or investment in, lend funds or become indebted to, be associated with, advise or assist others with, be employed by or otherwise render services to any person or entity that is engaged in or competes with the Business of the Company.  Executive acknowledges that because of Executive's access to the Company's Confidential Business Information, and because of the nationwide nature of the Business, a violation of this covenant will cause irreparable injury to the Company.  The ownership of less than two percent (2%) of a publicly-traded corporation or entity shall not be deemed, by itself, to violate the non-competition provisions of this Section 5.

Id., ¶ 5.

31.     CHG, in an effort to create a greater incentive for Hale to perform her job duties to her fullest potential, awarded Hale 1,007 Class B-1 and 806 Class B-2 Units in CHG.  In connection with CHG's award, Hale entered into two Restricted Unit Award Agreements (collectively "Award Agreements") with CHG on February 12, 2015.  The Unit Agreements contain identical restrictive covenant language as excerpted below.  True and correct copies of the Unit Agreements are attached as composite Exhibit "B."

32.     In the Award Agreements, Hale agreed to be bound by, among other things, another non-competition agreement which states, in relevant part:

(a) Employee hereby covenants and agrees that, except as provided below, throughout any time in which Employee is employed by the Company or any of its Subsidiaries (the "Term of Employment") and during the period commencing on the last day of the Term of Employment and ending on the first anniversary of the last day of the Term of Employment (the "Non-Competition Period"), Employee shall not, without the express written consent of the Company, directly or indirectly, engage in any activity which is, or participate or invest in or assist (whether as an owner, part-owner, stock-holder, partner, director, officer, trustee, employee, agent, independent contractor or consultant, or in any other capacity) any Competitive Enterprise (as defined below), except that Employee may make passive investments in a Competitive Enterprise the shares of which are publicly traded if such investment constitutes less than one percent (1%) of the equity of such enterprise.  Without implied limitation, the foregoing covenant shall include hiring or attempting to hire for or on behalf of any such Competitive

Enterprise or other entity any officer or other employee of the Company or its Affiliates, encouraging or soliciting any officer or employee to terminate his, her or its relationship or employment with the Company or any of its Affiliates, soliciting for or on behalf of any such Competitive Enterprise any client or customer of the Company or any of its Affiliates.  For purposes of this Section 10(a), "officer' or "employee" (whether in the singular or plural) shall mean and refer to any individual who was an officer or employee of the Company or any of its direct or indirect Subsidiaries at the time of the attempted or actual hiring, encouragement, solicitation or similar action, or was an officer or employee of the Company or any of its direct or indirect Subsidiaries at any time within the twelve months prior to the time of the attempted or actual hiring, encouragement, solicitation or similar action.

(b) In furtherance and not in limitation of the foregoing restrictions, during the Term of Employment and the Non-Competition Period, Employee shall not devote any time to consulting, lecturing or engaging in other self-employment or employment activities with a Competitive Enterprise without the prior written consent of the Company.

(c) "Competitive Enterprise" shall mean, any individual, corporation, partnership, limited liability company, unincorporated association, government or agency or political subdivision thereof or other entity the activities, products or services of which are competitive with activities, products or services of the Company or any of its Subsidiaries in any state in which the Company is engaged or intends to engage in the same or a similar business during the one year period preceding Employee's termination of employment with the Company or its Subsidiary or during the Non-Competition Period.

…

(e) Employee acknowledges that he [/she] has and will necessarily become informed of, and have access to, certain valuable and confidential information of the Company and its Affiliates, including without limitation, trade secrets, technical information, plans, lists of customers, data, records, fee schedules, computer programs, manuals, processes, methods, intangible rights, contracts, agreements, licenses, personnel information and the identity of health care providers (collectively, "Confidential Information"), and that the Confidential Information, even though it may be contributed, developed or acquired in whole or in part by Employee, is the Company's exclusive property to be held by Employee in trust and solely for the Company's benefit.  Accordingly, except as required by law, Employee shall not, at any time, either during or subsequent to the Term of Employment, reveal, report, publish, copy, transcribe, [t]ransfer or otherwise disclose, any of the Confidential Information without the prior written consent of the Company, except (i) to responsible officers and employees of the Company and its Subsidiaries and other responsible persons who are in a contractual or fiduciary relationship

9

with the Company or one of its Subsidiaries, (ii) for information which legally and legitimately is or becomes of general public knowledge from authorized sources other than Employee or (iii) as may otherwise be required by law or legal process.

(f)  Upon termination of the Term of Employment, Employee shall promptly deliver to the Company all property and possessions of the Company and its Subsidiaries, including drawings, manuals, letters, notes, notebooks, reports, copies, deliverable Confidential Information and all other materials relating the Company's and its Subsidiaries' business which are in the Employee's possession or control.

(g)  This Section 10 shall survive the termination of this Award Agreement.

See Exh. "B," ¶ 10.

33.    The restraints on disclosure and competition specified in the Employment Agreement and Award Agreements (collectively "Agreements") are reasonably necessary to protect the legitimate business interests of CHG.

34.    Specifically, CHG's legitimate business interests include, but are not limited to, its: (1) trade secrets; (2) valuable confidential business or professional information; (3) substantial relationships with specific existing clients and healthcare professionals; (4) client and healthcare professional goodwill within CHG's specific geographic market area; and (5) the investment in education and training of an employee.

**Hale's Violation of and MedPartners' Tortious Interference With the Agreements**

35.    On or about January 8, 2016, Hale voluntarily resigned from her employment with CHG.

36.    Days later, Hale commenced employment with MedPartners, a direct competitor of CHG, as its Vice President of Operations.

37.    The office location of MedPartners is located only 17 miles away from the CHG office where Hale had worked.

38.     Upon information and belief, MedPartners was aware of the restraints on disclosure and competition that applied to Hale as a result of the Agreements Hale had entered into.

39.     Of particular relevance, Jay Mays, the CEO and co-founder of MedPartners, was a former Director of CHG, who also had entered into a similar non-compete and non-disclosure agreement with CHG during his employment.

40.     Upon information and belief, Hale has used and/or disclosed, and continues to use and/or disclose the confidential information and trade secrets she obtained from CHG in the course of her new business activities, for the benefit of herself and/or MedPartners.

41.     Upon information and belief, the confidential information and trade secrets Hale obtained from CHG include, but are not limited to, information relating to current, former and prospective clients; strategies for competitive credentialing of healthcare professionals; methods and types of recruitment and placement services preferred by CHG's clients; sales and marketing techniques; strategic training and coaching methods for employees and leadership; and financial information relating to the business of CHG.  Such information constitutes valuable non-public, confidential, and trade secret information belonging to CHG, as defined under the Agreements (collectively, the "Trade Secrets").

42.     If divulged to a competitor, such as Hale's current employer MedPartners, the Trade Secrets could be used to lure away CHG's customers, undermine CHG's marketing efforts, and damage its competitive standing in the industry.

43.     Hale retained CHG's confidential and proprietary information, including its Trade Secrets, after her resignation, and they remain in her and/or MedPartners' current possession, custody, or control.

11

44. By working for or with one of CHG's direct competitors, within days of her resignation from CHG, Hale is able to use the relationships she developed and business strategies she learned at CHG to solicit CHG's customers to work with her at MedPartners, as well as to use CHG's confidential information to solicit CHG's clients and employees, to the unfair advantage of Hale and MedPartners, and to the disadvantage of CHG.

45. On or about February 1, 2016, CHG demanded that Hale comply with the post-employment restrictions in her Agreements and to cease and desist from violating her contractual obligations.

46. Hale has refused to comply with the terms and conditions of the Agreements' post-employment restrictions, necessitating this Complaint.

47. Notably, Hale knew what she was doing when she violated the Agreements, as this is not the first time Hale has violated post-employment restrictive covenants with an employer.

48. Hale's former employer, Talent Tree, Inc. ("Talent Tree") also had to file a Complaint against Hale to obtain an injunction and damages as a result of Hale's breach of the non-competition and non-solicitation provisions contained in her employment agreement with Talent Tree. See Talent Tree, Inc. v. Elizabeth Hale, et. al., Case No. 02 A 12253-4 filed in the Superior Court of Gwinnett County Georgia. The Superior Court ultimately enjoined Hale from violating her agreement, and the matter later settled.

### COUNT I – BREACH OF CONTRACT (Employment Agreement)

49. CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

50.     Hale entered into an enforceable Employment Agreement with CHG, as set forth above, wherein Hale agreed, among other things, (1) to not work on behalf of any business in competition with CHG during her employment with CHG and for a period of one year following Hale's separation from employment; and (2) to not use or disclose CHG's confidential information and Trade Secrets.  See Exh. "A."

51.     Hale breached the Employment Agreement by, *inter alia*, (1) accepting employment with a direct competitor of CHG within days of her voluntary resignation from CHG; and (2) converting and disclosing confidential information and Trade Secrets belonging to CHG.

52.     CHG is entitled to specific performance of the Employment Agreement in the form of the immediate return of all copies of its confidential information and Trade Secrets and independent verification that no such property remains in Hale's possession.

53.     As a direct and proximate result of Hale's breach of the Employment Agreement, CHG has suffered and will continue to suffer damages.

54.     CHG does not have an adequate remedy at law for the harm and damage which Hale's breach of the Employment Agreement has caused.

55.     CHG has suffered economic losses as a result of Hale's breach.

WHEREFORE, CHG demands the following:

(a)     injunctive relief enforcing the Employment Agreement and enjoining any conduct in violation thereof;

(b)     actual damages flowing from the breach; and

(c)     all other remedies available at law or in equity as this Court deems just and appropriate.

13

## <u>COUNT II – BREACH OF CONTRACT (Award Agreements)</u>

56.    CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

57.    Hale entered into an enforceable Award Agreements with CHG, as set forth above, wherein Hale agreed, among other things, (1) to not work on behalf of any business in competition with CHG during her employment with CHG <u>and for a period of one year following Hale's separation of employment</u>; and (2) to not use or disclose CHG's confidential information and Trade Secrets.  <u>See</u> Exh. "B."

58.    Hale breached the Award Agreements by, *inter alia*, (1) accepting employment with a direct competitor of CHG within weeks of her voluntary resignation from CHG; and (2) converting and disclosing confidential information and Trade Secrets belonging to CHG.

59.    CHG is entitled to specific performance of the Award Agreements in the form of the immediate return of all copies of its confidential information and Trade Secrets and independent verification that no such property remains in Hale's possession.

60.    As a direct and proximate result of Hale's breach of the Award Agreements, CHG has suffered and will continue to suffer damages.

61.    CHG does not have an adequate remedy at law for the harm and damage which Hale's breach of the Award Agreements has caused.

62.    CHG has suffered economic losses as a result of Hale's breach.

WHEREFORE, CHG demands the following:

(a) injunctive relief enforcing the Award Agreements and enjoining any conduct in violation thereof;

(b) actual damages flowing from the breach; and

14

(c) all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS/VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT (Fla. Stat. § 688.001, *et seq.*)

63.     CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

64.     CHG possesses Trade Secrets, which include information relating to current, former and prospective clients; strategies for competitive credentialing of healthcare professionals; methods and types of recruitment and placement services preferred by CHG's clients; sales and marketing techniques; strategic training and coaching methods for employees and leadership; and financial information relating to the business of CHG.  These Trade Secrets derive independent economic value, actual or potential, from not being generally known to the public and not being readily ascertainable by proper means by the public or any other person who may obtain commercial or economic value from the disclosure of such information.

65.     CHG has made reasonable efforts under the circumstances to maintain the secrecy of such confidential and proprietary information and Trade Secrets by taking steps to protect it. These efforts include, but are not limited to, entering into the Agreements with Hale, whereby Hale acknowledged the confidential nature of this information and agreed not to use or disclose it, either during or subsequent to the termination of her employment.

66.     Hale misappropriated CHG's Trade Secrets without the knowledge or consent of CHG and with the purpose of utilizing them for her own benefit and/or the benefit of MedPartners.

67.     Hale knew that CHG's Trade Secrets were the property of CHG and that such property constituted confidential Trade Secrets, that she had a duty to CHG and a contractual

obligation to maintain their secrecy or limit their use, and that she was not permitted to remove, utilize, or disclose the Trade Secrets.  Hale's actions, therefore, were willful and malicious.

68.      Hale utilized CHG's Trade Secrets for personal gain and/or for the benefit of MedPartners.

69.      Hale's actions constitute misappropriation of CHG's Trade Secrets.

70.      Hale has been unjustly enriched by her unlawful use of CHG's Trade Secrets, and CHG is entitled to damages including, but not limited to, disgorgement and the immediate return of all confidential information of CHG in Hale's possession, custody, or control.

71.      Hale's actions were taken in willful, wanton, and/or reckless disregard of Hale's rights and warrant the imposition of exemplary damages.

WHEREFORE, CHG demands the following:

(a)      injunctive relief preventing Hale from utilizing CHG's confidential information and Trade Secrets, and requiring the disgorgement and immediate return of all confidential information and Trade Secrets of CHG's in Hale's possession, custody, or control;

(b)      attorneys' fees and costs incurred in bringing this action;

(c)      actual damages flowing from Hale's misappropriation of CHG's Trade Secrets; and

(d)      all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT IV – INJUNCTIVE RELIEF

72.      CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

16

73.     If not enjoined, Hale will continue to compete with CHG by Hale working at MedPartners, in violation of her Agreements, and Hale will continue to use and/or disclose CHG's confidential information and Trade Secrets at MedPartners, which will result in irreparable harm to CHG for which monetary damages would be an inadequate remedy.

74.     Accordingly, CHG seeks an order requiring Hale to immediately return to CHG all of CHG's property in her possession, custody, or control, including but not limited to, CHG's confidential information and Trade Secrets.

75.     CHG further seeks an injunction preventing Hale from transferring, using, or disclosing any confidential information or Trade Secrets belonging to CHG, for her benefit or the benefit of any CHG competitor.

WHEREFORE, CHG demands the following:

(a)     injunctive relief preventing Hale from directly or indirectly transferring, using, or disclosing CHG's confidential information and Trade Secrets;

(b)     injunctive relief requiring Hale to return any and all property of CHG including, but not limited to, CHG's confidential information and Trade Secrets;

(c)     injunctive relief preventing Hale from engaging in, working for and consulting with any business which competes with CHG, in the geographic areas where CHG does business,  for the agreed upon one (1) year period; and

(d)     all other remedies available at law or in equity as this Court deems just and appropriate.

## COUNT V – MEDPARTNERS' TORTIOUS INTERFERENCE
## WITH CONTRACTUAL RELATIONSHIPS  (MedPartners)

76. CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

77. CHG has a valid, enforceable and advantageous contractual relationship with Hale, and the Agreements Hale entered into with CHG contain restrictive covenants, including non-competition, non-solicitation, and confidentiality provisions.  See Exhs. "A" and "B."

78. MedPartners is employing Hale in violation of the Agreements.

79. MedPartners knows that Hale is violating her Agreements by working for it, and that CHG has an advantageous contractual relationship with Hale.  MedPartners is fully aware of Hale's Agreements with CHG, which prohibits her from competing with CHG by, *inter alia*, accepting employment with direct competitors, such as MedPartners, and disclosing CHG's Trade Secrets and other confidential and proprietary information of CHG.  MedPartners is benefiting from Hale's actions and encouraging and/or permitting them.

80. MedPartners intentionally and unjustifiably interfered with CHG's contractual relationship with Hale by inducing her to and/or assisting her in breaching her restrictive covenants by leaving CHG, commencing work at MedPartners, CHG's direct competitor, and by having her utilize CHG's Trade Secrets and confidential information for MedPartners' benefit.

81. CHG has suffered damages as a result of MedPartners' unjustified interference.

WHEREFORE, CHG demands the following:

      (a)     injunctive relief preventing MedPartners from continuing to interfere with CHG's contractual relationships;

      (b)     actual damages flowing from the tortious interference; and

      (c)     all other remedies available at law or in equity as this Court deems just

and appropriate.

## COUNT VI – FEDERAL UNFAIR COMPETITION

88.     CHG repeats and realleges Paragraphs 1 through 48 of this Verified Complaint as if fully set forth herein.

89.     Defendants have used CHG's confidential and proprietary information and Trade Secrets in the course of MedPartners conducting its business and were on notice of the protected nature of CHG's Trade Secrets and confidential and proprietary information.

90.     Defendants use of CHG's confidential and proprietary information and Trade Secrets creates a false designation of origin or false representation, has misappropriated a valuable property right and the good will of CHG, and has attempted to falsely create, in the minds of consumers, that CHG's confidential and proprietary information and Trade Secrets MedPartners is using to conduct its business originated from Defendants, in an attempt to induce customers to utilize MedPartners.

91.     Defendants use of a false designation of origin or false representation causes and is likely to cause confusion, mistake or deception of the public to capitalize on the favorable commercial impression created by CHG and the association with the success of CHG.

92.     Defendants have been unjustly enriched by misappropriating and trading on the goodwill and reputation developed by CHG at great effort and expense.

93.     Defendants' unlawful conduct, including as described above, was deliberate, knowing and in willful disregard of CHG's property rights.

94.     Defendants' conduct, including as described here, constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

95.     CHG has been damaged by Defendants' acts in an amount to be determined at

trial, and if Defendants' conduct is allowed to continue, CHG's goodwill and reputation will continue to suffer immediate, substantial and irreparable injury that cannot be adequately calculated and compensated in monetary damages.

WHEREFORE, CHG demands the following:

(a)  injunctive relief enjoining Defendants, and anyone acting in concert with them or on their behalf, from further unfair and deceptive acts or practices;

(b)  award compensatory damages and interest to CHG in an amount to be proven at trial;

(c)  award CHG costs, including attorneys' fees incurred by CHG from Defendants pursuant to the Lanham Act; and

(d)  all other remedies available at law or in equity as this Court deems just and appropriate.

Dated:  May 16, 2016

Respectfully submitted,

By: s/ Jennifer Schwartz
 Jennifer A. Schwartz, Esq.
 FL Bar No. 502431
 E-mail:  *jschwartz@littler.com*
 Samantha Dunton-Gallagher, Esq.
 FL Bar No. 105100
 E-mail: *sdunton@littler.com*
 **LITTLER MENDELSON P.C.**
 333 S.E. 2nd Avenue
 Suite 2700
 Miami, Florida  33131
 Telephone:  (305) 400-7500
 Facsimile:   (305) 603-2552

## VERIFICATION

BEFORE ME, the undersigned authority, personally appeared Beverly Leonard, Vice President of Weatherby Healthcare, who being duly sworn, deposes and says that she has reviewed the foregoing Verified Complaint, that she has personal knowledge of the factual allegations therein, and that the allegations are true and correct.

_____
Beverly Leonard

Subscribed and sworn before me
This __16__ day of __May__, 2016

_____, Notary Public
County of Broward, State of Florida
My Commission Expires:
April 07, 2020

TIFFANY A. HAMMOND
Notary Public - State of Florida
Commission # FF 980212
My Comm. Expires Apr 7, 2020

21